Opinion issued August 8, 2002








 






In The

Court of Appeals

For The

First District of Texas






NO. 01-00-01134-CV

____________


KAREN HARRIS, INDIVIDUALLY AND

ON BEHALF OF THE ESTATE OF 

MELBA COOPER, Appellant


V.


WHMC, INC., D/B/A 

WEST HOUSTON MEDICAL CENTER, Appellee






On Appeal from the 334th District Court

Harris County, Texas

Trial Court Cause No. 98-52790






O P I N I O N

 Melba Cooper died after Dr. Pedro Caram performed back surgery at West
Houston Medical Center (WHMC). Karen Harris, Cooper's daughter, sued the doctor
and the hospital. Dr. Caram settled, and a jury found WHMC was not negligent. 
Harris contends the trial court erred in excluding from evidence certain e-mail
correspondence as privileged. She contends the exclusion was error and was
calculated to and did cause the rendition of an improper jury verdict, and, as a result,
an improper trial court judgment. We affirm. 

Background (1)


 On January 16, 1997, Dr. Pedro Caram, a neurosurgeon, performed a
decompressive laminectomy on 79-year-old Melba Cooper in an attempt to relieve
pressure on nerves inside her spinal cord. Caram testified that, during the surgery,
he used an electric drill to shave or thin out bone in Cooper's back. The drill was a
Stryker Command II model that was comprised of a handpiece and a bur with a
unique J-notch design that locked into the handpiece. During Cooper's surgery,
Caram chose to use a Dupuy bur instead of the Stryker bur. The Dupuy bur also had
the distinctive J-notch design. The burs made by Stryker and Dupuy were
interchangeable. 

 Despite having checked the equipment before the surgery, Caram noticed a
lateral movement and "wobble" during the surgery. A nurse asked Caram if he
wanted another drill, but he refused. He continued to use the drill which came into
contact with some of the nerves in Cooper's spinal cord. As a result, Cooper
subsequently developed bowel and bladder problems, and she later died from multiple
organ failure on February 20, 1997.

 Harris's retained expert neurosurgeon, Dr. Toussaint LeClercq, testified that
the type of drill used here oscillated or "wobbled" when its bur was not seated
properly, and that a doctor should be able to fix such a problem easily. LeClercq
further testified that continuing to operate with a drill that is "wobbling" was a
violation of the standard of care. 

 Harris argued WHMC was negligent for supplying the equipment to Caram
with a Dupuy bur instead of a Stryker bur. Harris did not allege either piece of
equipment was, in itself, defective. She did, however, argue that, when the Dupuy
bur was used with the Stryker drill, the drill was defective.

 The Food and Drug Administration conducted an investigation of the Stryker 
drill after Cooper's death. During its investigation, the FDA requested documents
from the hospital related to the surgery. The hospital provided the information,
including four interoffice memoranda exchanged via electronic mail (e-mail) between
hospital employees. The e-mail communications were between Patricia Simmons,
WHMC's Director of Surgical Services, and Lynn McCormick, its Risk Manager. 
McCormick was on the medical and peer review committees at the hospital. 

 Harris attempted to obtain copies of the e-mails through routine discovery
requests, but WHMC objected, contending the documents were subject to the peer
review and medical committee privileges. Harris then obtained the e-mails from the
FDA under the Freedom of Information Act.

 In response to WHMC's motion in limine seeking to exclude the e-mails, the
trial court ruled the documents would not be admitted into evidence. The trial court
ruled Harris could use the e-mails at trial for impeachment purposes, but the e-mails
themselves would not be admitted.

 During trial, Harris filed a motion to admit the FDA report into evidence, and
the parties conducted a hearing outside the presence of the jury. Susan Gorchochi,
the hospital's medical staff quality improvement coordinator at the time of Cooper's
death, testified that McCormick, the risk manager, had asked Simmons to generate
the documents for review by the medical committee at the hospital to evaluate
Cooper's death and help improve patient care. Gorchochi testified the documents
were always maintained in confidence. The trial court ruled, once again, the e-mails
were privileged and protected from discovery.

 The jury found Caram's negligence proximately caused Cooper's injuries and
death. (2) Because Caram had settled before trial and the jury found WHMC was not
negligent, Harris recovered nothing from the jury verdict. 

Privilege


 In three points of error, Harris argues the jury was misled and the trial court
erred when it ruled the e-mails were privileged and inadmissible because (1) the
Texas hospital committee peer review privilege is not so broad as to protect "quality
assurance documentation privilege;" (2) unsolicited e-mails sent in the ordinary
course of business by a non-committee member hospital employee to the risk manager
are not privileged; and (3) documents which are not proceedings or records of a
medical peer review committee are not privileged.

 The admission or exclusion of evidence is a matter within the trial court's
broad discretion. City of Brownsville v. Alvarado, 897 S.W.2d 750, 753 (Tex. 1995). 
To obtain reversal of a judgment based on error in the admission or exclusion of
evidence, an appellant must show that the trial court's ruling was in error and that the
error was calculated to cause and probably did cause the rendition of an improper
judgment. Tex. R. App. P. 44.1(a)(1); Alvarado, 897 S.W.2d at 753-54.

 Harris argues that her inability to impeach Simmons with the e-mails
"permitted the jury to accept a skewed view of the facts and be misled." Here is a
summary of Simmons's testimony regarding the e-mails.

 Simmons was asked if she learned from the Stryker representative, after the
surgery, that there was, in fact, a problem with the non-Stryker drill bit in the Stryker
drill. She responded, "No, I did not." After discussions with counsel for both parties,
the trial court allowed Harris to show Simmons an e-mail generated on October 9,
1997, 10 months after Cooper's surgery, in an attempt to refresh her memory. After
reviewing the e-mail, Simmons testified the Stryker representative never told her in
January of 1997 that there was a problem with the drill bit. She testified he told her
that the drill functioned "fine." A few questions later, Simmons was, once again,
asked to refer to that e-mail in an attempt to refresh her memory as to whether the
Stryker representative provided her with a written report after he inspected the drill. 
Simmons responded that reviewing the e-mail did not refresh her memory about any
report she may have received.

 Simmons was asked if she looked to see how the surgery was reflected in
Cooper's medical chart. Simmons responded that she had never reviewed Cooper's
medical records. In an attempt to refresh her memory, she was provided a copy of an
e-mail she sent to the risk manager on January 17, 1997, but, after reading the e-mail,
Simmons testified she had never read Cooper's chart. The e-mail read, in part, ". . .
the notes in the chart from Caram are benign." The trial court excused the jury, and
Harris accused Simmons of perjury. WHMC suggested Harris ask Simmons, "Well,
if you didn't read the chart notes as you are testifying here, how can you characterize
them as benign?" The trial then reconvened and a question similar to the one
suggested was asked. After reviewing the e-mail, Simmons explained that Caram had
told her what he had written in the chart, and she had never reviewed it herself. 

 Simmons was then asked to look at the e-mail to refresh her memory regarding
any oscillation that may have occurred during Cooper's surgery. Simmons reviewed
the e-mail and confirmed that, on January 17, 1997, it was her understanding that the
drill was "oscillating quite a bit" during the surgery.

 Finally, Simmons was again asked to refresh her memory with the e-mails to 
determine if the Stryker representative gave her a written report. She responded she
received no written report. 

 Although Harris asserts she was not allowed to use the e-mails even for
impeachment purposes, the record does not support that assertion. When Harris first
tried to introduce an e-mail in an attempt to impeach Simmons, the trial court
reminded Harris the e-mail could not be used "for all purposes" but could be used
"for impeachment purposes without disclosing its contents." Harris asked for
clarification, and the court responded "[y]ou can use this for-not putting it in
evidence, not reading it into evidence. You can use it for other burdens of proof so
long as you do not disclose its contents." 

 We have reviewed the e-mails and the oral testimony that was admitted
concerning the e-mails. We conclude that all the material information in the e-mails
was admitted into evidence through the testimony of Simmons and other witnesses. 
We also conclude that even if the trial court erred in excluding the e-mails from
evidence, it has not been shown that the trial court's ruling was calculated to and
probably did cause the rendition of an improper judgment. Phrased differently, we
conclude that even if the trial court erred in excluding the e-mails, it was harmless
error and did not cause the rendition of an improper judgment. See Alvardo, 897
S.W.2d at 753-54. 

 We overrule Harris's three points of error.

Conclusion


 We affirm the judgment.


 Jackson B. Smith, Jr.

 Justice


Panel consists of Justices Mirabal, Taft, and Smith. (3)


Do not publish. Tex. R. App. P. 47.

 


 
1. Harris does not challenge the sufficiency of the evidence. Therefore, we view
the evidence in the light most favorable to the verdict. Tex. R. App. P. 38.1(f).
2. Jury question 1 specifically asked, "Did the negligence, if any, of the parties
named below proximately cause the injuries in question (other than death) to
MELBA COOPER?" The jury answered "Yes" for Pedro M. Caram, M.D.,
and "No" for West Houston Medical Center. The responses were the same for
jury question 2, which asked, "Did the negligence, if any, of the parties named
below proximately cause the death of MELBA COOPER?"
3. The Honorable Jackson B. Smith, Jr., retired Justice, Court of Appeals, First
District of Texas at Houston, participating by assignment.